IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:18-cv-01872-MEH

ANDRE HAKIZIMANA,

      Plaintiff,

v.

JBS USA, LLC,

      Defendant.

---

## MOTION FOR SUMMARY JUDGMENT

---

Defendant JBS USA, LLC n/k/a JBS USA Food Company ("JBS"), pursuant to Fed. R. Civ. P. 56(a) and D.C.COLO.LCivR 56.1, moves for summary judgment on Plaintiff Andre Hakizimana's Employment Discrimination Complaint ("Complaint"). (Doc. 1).

## I.      INTRODUCTION.

Summary judgment for JBS is proper on Hakizimana's claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act ("ADA"), the Colorado Wage Act ("CWA"), and Hakizimana's unidentified tort claims. Hakizimana did not timely file his claims under Title VII and the ADA. He lacks *prima facie* claims of race, color, or national origin discrimination, harassment, retaliation, failure to accommodate, and wrongful termination. JBS took each challenged action for a legitimate, non-discriminatory, non-retaliatory, and non-pretextual reason. Hakizimana is barred from asserting claims for injuries that arose out of and in the course of his employment with JBS. Hakizimana can show no genuine dispute as to any

material fact sufficient to avoid summary judgment. Thus, JBS is entitled to summary judgment on all claims.

## II.     <u>STATEMENT OF UNDISPUTED MATERIAL FACTS.[1]</u>

### A.     JBS Employed Hakizimana As A Gutter.

1. On May 29, 2012, JBS hired Hakizimana in the "gutter" position. Deposition of Andre Hakizimana ("Hakizimana Dep.") 17:19-24, attached as Exhibit A.

2. Hakizimana worked on the second shift, in which he started work at 3:00 p.m. and typically ended his shift at 11:30 p.m. Hakizimana Dep. 18:9-21.

3. Hakizimana and the other second shift employees were occasionally required to work longer or shorter hours based on JBS' operational needs. Hakizimana Dep. 18:9-21.

4. JBS' handbook prohibits employees from abandoning their work station. General infractions justifying disciplinary action include "[r]efusal of any employee to carry out the request of management to perform work as directed; or neglect of duty such as loafing, wasting working time, being out of the work area without supervisor's permission, or sleeping on the job. Leaving the company premises before your work shift ends without getting permission from your supervisor or manager in charge of your work area." Exhibit B at p. 9.

5. When hired, Hakizimana acknowledged that he received JBS' employee handbook. Hakizimana Dep. 20:1-3; Exhibit C.

6. During his six months of employment, Hakizimana received, reviewed, or was read JBS' policies and procedures at least twice. Hakizimana Dep. 20:17-21:6; Deposition of Jason Miller ("Miller Dep.") 55:17-22, attached as Exhibit D; Ex. C.

---

[1] Many of the following facts are characterized as "undisputed" solely for purposes of this motion.

**B.      JBS Prohibits Unlawful Discrimination, Harassment, And Retaliation.**

7.   JBS expects its employees to follow its policies and procedures prohibiting discrimination, harassment, and retaliation. Ex. B at pp. 4-5.

8.   JBS prohibits discrimination and harassment based on race and national origin, and prohibits retaliation for reporting discrimination and harassment. Ex. B at pp. 4-5; Miller Dep. 25:1-21.

9.   JBS' policies and procedures require employees who believe they have been discriminated against to report their concerns to the Human Resources department. Hakizimana Dep. 21:13-17; Ex. B at pp. 4-5.

10. Hakizimana was familiar with JBS' policies and procedures prohibiting discrimination, harassment, and retaliation. Hakizimana Dep. 21:13-17.

**C.      Hakizimana's Complaint To JBS.**

11. Within three months of starting his employment, Hakizimana alleged that his co-worker, Enrico Marceleno called him "nigga" and looked at him with an "angry face." Compl. at 6; Hakizimana Dep. 28:4-8.

12. Marceleno was a gutter, the same position as Hakizimana. He did not have supervisory authority over Hakizimana, and was not his team lead. Hakizimana Dep. 29:2-4, 52:3-6.

13. Hakizimana complained to the Union regarding Marceleno's conduct and the Union referred him to JBS' Human Resources department. Hakizimana Dep. 34:2-8, 30:2-22.

14. The Human Resources department advised Hakizimana to speak to his superintendent. Hakizimana Dep. 31:2-7.

15. Hakizimana verbally complained to the superintendent that Marceleno was acting "angry to me." Hakizimana Dep. 30:2-7, 31:2-7.

16. In response to Hakizimana's complaint, the superintendent reviewed JBS' discrimination policies during a meeting with all the second shift gutters. Hakizimana Dep. 31:3-25, 32:17-21.

17. Hakizimana's superintendent further emphasized that discrimination and harassment is not tolerated at JBS. Hakizimana Dep. 31:3-25, 32:17-21.

18. Marceleno and Hakizimana both attended this meeting. Hakizimana Dep. 32:10-11.

19. After the superintendent's meeting, Hakizimana did not complain to JBS management again regarding Marceleno's conduct. Hakizimana Dep. 33:14-19.

20. Hakizimana did not have issues with any other co-workers, supervisors, or managers during his employment with JBS. Hakizimana Dep. 26:17-27:19.

### D.    Hakizimana's Injury While Employed By JBS.

21. On August 17, 2012, Hakizimana suffered an injury while working at the gut table. Compl. at 6; Exhibit E; Exhibit F.

22. Hakizimana was cut on the back of his leg by his co-worker, Marceleno, between 10:00 p.m. and 11:00 p.m., but Hakizimana did not see Marceleno cut him. Hakizimana Dep. 39:4-9, 40:21-25. Ex. E.

23. Immediately after the injury, Hakizimana was taken to the health services department to receive medical treatment. Hakizimana Dep. 37:10-23.

24. While in the health services department, Hakizimana gave a statement regarding how the injury occurred. Hakizimana Dep. 37:10-23; Ex. E.

25. Hakizimana reported that "[w]e were working at gutter table, the person who cut me, I was behind him working and after that he done his step of job and he fell [or pull] down sometime cutting me with his knife in his hands." Ex. E.

26. Marceleno also provided a statement to JBS, reporting that he "fell down into liver area as I proceeded back up knife was still in right hand reached over and sliced Andre in his left leg." Exhibit G.

27. Pursuant to JBS' standard policy and procedure following a workplace accident, Hakizimana was given a drug test. Ex. B at p. 6; Hakizimana Dep. 41:12-15.

28. JBS investigated the cause of Hakizimana's injury by taking statements from Hakizimana and Marceleno. Ex. E, Ex. G.

29. JBS determined that the incident was an accident caused by Marceleno slipping and falling at the gut table. Exhibit H.

30. JBS called an ambulance and Hakizimana was taken to North Colorado Medical Center in Greeley, Colorado. Hakizimana Dep. 41:10-11, 41:16-22.

31. The Emergency Room Report stated that "[patient] was accidentally cut on L posterior thigh by a co-worker cutting meat…. [patient] says that a coworker tripped and fell and cut his leg with a knife." Ex. F.

32. On August 18, 2012, Hakizimana underwent surgery to repair the cut on his leg. Hakizimana Dep. 45:22-23.

33. After his surgery, Hakizimana's Physician wrote a note stating that "[h]e may return to work in 5 days if he can do light duty and is able to rest his leg." Exhibit I.

34. Records from Hakizimana's August 21, 2012, medical examination revealed his "chief complaint" was a "L[eft] thigh laceration. At work while working cutting meat, cut open cow, the person in front of me fell he had a knife in his hand, when he fell he cut my L thigh." Exhibit J.

35. Records from an August 23, 2012, medical examination revealed that Hakizimana complained that he was having to drive to work while on pain medication. Hakizimana Dep. 52:17-53-19; Exhibit K.

36. Hakizimana's physician explained to him that "he needs to take the medication as soon as he wakes up in the morning 6 hours later he will be driving to work he can take another pill as soon as he gets to work and then not take another one until after he gets home following his eight-hour work shift." Hakizimana Dep. 52:17-53-19; Ex. K.

**E.    JBS' Accommodation, And Hakizimana's Workers' Compensation Claim.**

37. Following his injury, Hakizimana could not perform the essential functions of his job as a gutter. Hakizimana Dep. 119:13-25.

38. On August 23, 2012, JBS sent a letter to Hakizimana's treating physician, Dr. Catherine Smith, asking if Hakizimana had the physical capacity and ability to perform a light duty job in "Health services observation." Exhibit L.

39. In the Health Services Observation position, "[a]ll tasks performed will allow for minimal walk/stand, he may use crutches with no weight bearing and he may sit or lie with the left leg elevated. He will not drive while on pain medications. He will not be required to lift, carry, push or pull. Will be sitting sedentary in health services for observation by medical staff and provided support by staff for any pain management." Ex. L.

40. Dr. Smith approved the light duty position, confirming that Hakizimana could perform the job duties described. Ex. L.

41. The same day, Trudy Sawyer sent Hakizimana a letter explaining the approved light duty position. Exhibit M.

42. The light duty position paid $15.85 per hour, representing no change to Hakizimana's pay, and the hours were 3:00 p.m. - 11:30 p.m. or "gang time," Monday through Friday, representing no change to his schedule. Hakizimana Dep. 50:1-51:11; Ex. M.

43. Sawyer never reduced Hakizimana's pay or hours during the time of his employment. Hakizimana Dep. 115:3-9.

44. Hakizimana accepted the light duty position in Health Services Observation. Hakizimana Dep. 51:3-5.

45. Although Hakizimana accepted the light duty position, he alleges now that JBS should have let him stay home and not work the light-duty job because, "Sometimes you feel better when you are at home with the family members and they take care of you. I was doing nothing. There is no reason to go sitting at the JBS without doing nothing." Hakizimana Dep. 94:3-12.

46. After Hakizimana's workplace injury, JBS filed a workers' compensation claim on his behalf. Hakizimana Dep. 45:5-7; Exhibit N.

47. Hakizimana received workers' compensation benefits in an amount between $9,000 and $10,000. Hakizimana Dep. 45:14-46:16.

48. Hakizimana brought this lawsuit because he believes he deserved more compensation benefits than he received from his workers' compensation claim. Hakizimana Dep. 124:17-125:5.

**F.      Hakizimana Files Report With The Greeley Police Department.**

49. After Hakizimana's injury, he attempted to file a lawsuit against Marceleno for cutting his leg. Hakizimana Dep. 54:22-55:13.

50. The court told Hakizimana that he must report the incident to the police prior to filing a lawsuit, which he had not done. Hakizimana Dep. 54:22-25.

50328629.1

51. On September 11, 2012, Hakizimana went to the Greeley Police Department to report the alleged assault by Marceleno because he believed Marceleno cut him on purpose and wanted the Police to investigate. Exhibit O; Hakizimana Dep. 54:16-19.

52. Hakizimana did not report any alleged discriminatory or retaliatory conduct on behalf of JBS or JBS' management personnel. Ex. O.

53. The Greeley Police department investigated and concluded that the evidence was consistent with JBS' conclusion that the incident was an accident. Ex. O at 9.

### G.    Events Leading To Hakizimana's Termination.

54. On Friday, November 23, 2012, Trudy Sawyer, the Health Services Manager, called Human Resources Manager, Jason Miller, to report that two employees left the Health Services Department without receiving permission to leave. Miller Dep. 40:9-23; Deposition of Trudy Sawyer ("Sawyer Dep.") 55:7-58:6, 60:5-11 (attached as Exhibit P); Exhibits Q and R.

55. Miller went to investigate the report and encountered Hakizimana as he was returning to the Health Services Department. Hakizimana Dep. 65:4-11; Ex. Q.

56. Miller asked Hakizimana why he left the Health Services Department, to which Hakizimana explained that he had gone to the union's office and then to his car to get his phone. Miller Dep. 65:19-66:11; Hakizimana Dep. 65:4-11.

57. Hakizimana and Miller proceeded to the Health Services Department to discuss JBS' policies regarding leaving the work station without prior permission from a supervisor. Miller Dep. 55:17-56:15; Hakizimana Dep. 67:24-68:4.

58. Miller issued Hakizimana a Final Warning for violating JBS' policy prohibiting employees from leaving their workstation on an unscheduled break without receiving prior permission from a supervisor. Exhibit S.

8

59. The Final Warning stated: "you are receiving a final warning for walking off the job in regards to leaving your work area without authorization for [sic] from management. You understand the proper procedures if you need to take an unscheduled break and you must inform management or management support employee when you are leaving for an unscheduled break. You admitted to this violation and did not inform any management or management support this will not be tolerated. Any further occurrences will result in further discipline up to and including termination." Ex. S.

60. Hakizimana disputed the disciplinary action because he claimed that he was following his doctor's order to stretch his leg. He admits, however, that he was never told that he could not stretch his leg, only that he must receive permission prior to leaving the health services office. Hakizimana Dep. 76:10-77:17.

61. Hakizimana left the meeting to discuss the written warning with his union representatives. Hakizimana Dep. 70:10-13; Miller Dep. 55:17-56:15.

62. Hakizimana and a union representative then went back to the Health Services Department to further discuss the written warning with Miller. Hakizimana Dep. 71:6-14; Miller Dep. 55:17-56:15.

63. Miller again explained why Hakizimana received the written warning and explicitly told Hakizimana that he was not fired or terminated. Hakizimana Dep. 72:20-22; Sawyer Dep. 57:2-16; Miller Dep. 53:6-8; Exs. A, Q, and R.

64. After this meeting, rather than returning to his work station and even though his work shift was not over, Hakizimana went to his car and left JBS' premises. Hakizimana Dep. 72:16:19; Miller Dep. 56:20-57:1.

50328629.1

65. This constituted a second violation of JBS' policies and procedures prohibiting employees from abandoning their work station prior to the end of their shift. Ex. B at 9; Miller Dep. 59:14-25.

66. After Hakizimana abandoned his work station for the second time prior to the end of his shift on November 23, 2012, Miller decided to terminate his employment. Miller Dep. 61:2-4.

67. On Monday, November 26, 2012, Hakizimana returned to JBS to speak with a union representative and once again speak with Miller. Hakizimana Dep. 73:19-24.

68. Miller informed Hakizimana and the union representative that JBS was terminating Hakizimana's employment because he walked off the job on November 23 and abandoned his work station prior to the end of his shift. Hakizimana Dep. 74:2-14.

69. Hakizimana admits that Miller did not make any discriminatory remarks or comments toward him prior to, during, or after the termination meeting. Hakizimana Dep. 104:13-15.

70. On November 26, 2012, JBS implemented Hakizimana's termination. Miller Dep. 60:16-61:4; Doc. 19, at 11 ("The following facts are undisputed… On November 26, 2012, Mr. Hakizimana's employment was terminated.").

71. Hakizimana alleges that his termination was discriminatory because "[he] didn't do any wrong," the termination occurred on November 23, 2012, JBS did not explain why he was terminated, and he is black. Hakizimana Dep. 102:3-103:8.

72. Hakizimana believes "there is no reason that I can be terminated except being black." Hakizimana also believes "the only reason I terminated, I was having disability or in the process of disability." Hakizimana Dep. 104:8-9, 103:23-24.

50328629.1

73. Miller never made any racial or disability-related comments toward Hakizimana prior to, during, or after he terminated Hakizimana. Hakizimana Dep. 104:13-15.

74. Hakizimana has not identified any other employee who left JBS' premises without permission and was not terminated. He admitted "No one left without permission, everybody stay in JBS premises." Hakizimana Dep. 110:12-111:1.

**H.    Hakizimana's EEOC Charge.**

75. On December 13, 2012, Hakizimana filled out an EEOC Intake Questionnaire in which he alleged a single claim of retaliation, based on Marceleno cutting his leg and Miller refusing to show him footage of the incident from a surveillance camera. Exhibit T.

76. On January 29, 2013, Hakizimana filed a Charge of Discrimination with the Colorado Civil Rights Division and the EEOC. Exhibit U.

77. Expanding on his original Intake Questionnaire, this time he alleged discrimination based on race, national origin, retaliation, and disability. Ex. U.

78. On February 7, 2013, the EEOC issued a Dismissal and Notice of Rights to Hakizimana. Exhibit V; Hakizimana Dep. 86:7-10.

79. On March 12, 2013, Hakizimana went to the EEOC office and requested that his case be reconsidered. Exhibit W.

80. Hakizimana made his handwritten request for reconsideration on a copy of an EEOC communication to him, in which the EEOC explicitly stated that Hakizimana's Charge was dismissed on February 7, 2013, and his only options were to "(a.) file a lawsuit in Federal District Court by May 8, 2013, or (b.) to submit your written request to Field Office Director Nancy Sienko for reconsideration of EEOC's dismissal." Ex. W.

81. Also on March 12, 2013, Hakizimana filled out another EEOC Intake Questionnaire, in which he alleged that he was discriminated against by JBS and Sedgwick American Insurance, the Workers Compensation Insurance Carrier. Exhibit X.

82. This time, Hakizimana alleged race, national origin, disability, and retaliation as the bases for discrimination. Ex. X.

83. In support of these allegations, Hakizimana alleged 1) "After been injury [sic] on job no compensation"; on February 21, 2013, "Stoping [sic] medical treatment on the [unknown] without feeling better. I need more therapy and medicine for pain"; on March 8, 2013, "Information about injury compensation." Ex. X.

84. Hakizimana further indicated that he did not presently have a disability but that used to have one. Ex. X.

85. On March 14, 2013, the EEOC sent a letter denying Hakizimana's request for reconsideration "because of the self-defeating nature of the information that was provided to [the EEOC]." Exhibit Y.

86. The letter also described that "[t]he final dismissal notice which was issued described your right to pursue the matter in court by filing a lawsuit within 90 days of your receipt of the dismissal notice. This 90 day period for filing a private lawsuit cannot be waived, extended, or restored by the EEOC." Ex. Y.

87. On May 20, 2013, after a request from Hakizimana's attorney, the EEOC issued its first Notice of Intent to Reconsider. Exhibit Z.

88. This letter stated that "[t]he Charging Party's right to sue is hereby vacated, unless the Charging Party has filed suit, the 90-day suit period has expired, or the Charging Party received a

notice of right to sue pursuant to 29 CFR Section 1601.28(a)(1) or (2)." Ex. Z (emphasis in original).

89. On June 10, 2013, Hakizimana filed an amended Charge alleging discrimination on the basis of race, color, national origin, retaliation, and disability. Exhibit AA.

90. Nearly three years later, on April 18, 2016, the EEOC issued its second Dismissal and Notice of Rights letter to Hakizimana. Exhibit BB.

91. On June 8, 2016, the EEOC once again issued a Notice of Reconsideration to re-open the investigation into Hakizimana's Charge. Exhibit CC.

92. On April 27, 2018, two years after the second Dismissal and five years after the first Dismissal, the EEOC issued its third and final Dismissal and Right to Sue Letter. Exhibit DD.

93. Hakizimana filed his Complaint in this action on July 24, 2018. Compl. at 1.

### III.    ARGUMENT.

### A.    HAKIZIMANA FAILED TO TIMELY FILE HIS TITLE VII AND ADA CLAIMS.

Hakizimana's Title VII and ADA claims are barred because he failed to file suit within 90 days of receiving his Notice of Right to Sue from the EEOC. The EEOC mailed its first Notice of Right to Sue to Hakizimana on February 7, 2013. Ex. V; Hakizimana Dep. 86:7-10. Applying the 3-day presumption of receipt of the mailing, Hakizimana's 90-day deadline to file expired, at the latest, May 13, 2013.[2] Fed. R. Civ. P. 6(e) (whenever a party is required to do some act after the service of a notice, "if the notice or paper is served upon the party by mail, 3 days shall be added to the prescribed period."); *Issa v. Comp USA*, 354 F.3d 1174, 1178 (10th

---

[2] JBS calculated the May 13, 2013 deadline by adding 90 days from February 7, the date of the Notice of Right to Sue, which puts the deadline at May 8, 2013. JBS added 3 days for the mailing, putting the filing date as May 11, 2013, a Saturday. Thus, the first court date after the deadline would be Monday, May 13, 2013.

Cir. 2003) ("[a] rebuttable presumption of receipt does arise on evidence that a properly addressed [right-to-sue letter was] placed in the care of the postal service.") (citations omitted). On May 20, 2013, **after** the expiration of Hakizimana's 90-day deadline to file suit, the EEOC notified Hakizimana that it intended to reconsider its Dismissal. Ex. Z. This letter stated, in part, "[t]he Charging Party's right to sue is hereby vacated, <u>unless</u> the Charging Party has filed suit, <u>the 90-day suit period has expired,</u> or the Charging Party received a notice of right to sue pursuant to 29 CFR Section 1601.28(a) (1) or (2)."[3] *Id.* (emphasis in original; second emphasis added.). Hakizimana failed to file suit within the 90-day period, filing his complaint more than five years later, on July 24, 2018.

The EEOC regulations expressly state that although the EEOC can reconsider a dismissal, the Commission's reconsideration does not resurrect a private action when the reconsideration itself occurs after ninety days of the issuance of a right to sue notice:

> "In cases where the Commission decides to reconsider a dismissal ... a notice of intent to reconsider will promptly issue. If such notice of intent to reconsider is issued within 90 days from receipt of a notice of right to sue and the charging party has not filed suit ... the notice of intent to reconsider will vacate the dismissal ... and revoke the notice of right to sue. <u>If the 90 day period has expired ... the notice of intent to reconsider will vacate the dismissal ... but will not revoke the notice of right to sue.</u>"

29 C.F.R. § 1601.21(b)(1) (emphasis added); *see also* 45 Fed. Reg. 48,616 (1980) (legislative comments regarding the regulation: "The revisions [to the regulation] ... make clear that the Commission will not issue a second notice of right to sue anew in situations where the original 90 day period in which to bring suit has expired prior to the notice of intent to reconsider...."); *Lute v. Singer Co.*, 678 F.2d 844, 846 (9th Cir. 1982) (EEOC's authority to rescind right to sue

---

[3] 29 CFR Section 1601.28(a)(1) refers to the issuance of Notice of Right to Sue upon request by the charging party. Hakizimana did not request a Notice of Right to Sue. Instead, the EEOC dismissed the action and issued the Notice on its own accord. Thus, this regulation is not relevant to Hakizimana's claims or JBS' defenses.

notice limited to situations in which EEOC notifies parties of intent to reconsider dismissal within ninety days of issuance of right to sue notice), modified and reh'g *en banc* denied, 696 F.2d 1266 (1983); *Trujillo v. General Elec. Co*., 621 F.2d 1084, 1086-87 (10th Cir. 1980) (same); *Gonzalez v. Firestone Tire & Rubber Co.*, 610 F.2d 241, 246 (5th Cir.1980) (same). The EEOC's May 20, 2013, revocation letter did not revive expired claims. All of Hakizimana's claims under Title VII and the ADA must be dismissed as a matter of law because they are not timely.

### B.    HAKIZIMANA LACKS A *PRIMA FACIE* DISCRIMINATION CLAIM.

Even if the Court were to find that Hakizimana's claims are timely, which they are not, his claims under Title VII still fail because he cannot establish a *prima facie* claim of race, color, or national origin discrimination. Hakizimana must demonstrate that (1) he was a member of a protected class; (2) he suffered an adverse employment action; and (3) the action arose in circumstances giving rise to an inference of discrimination. *Salemi v. Colo. Pub. Employees' Retirement Assn.,* 176 F. Supp. 3d 1132, 1144 (D. Colo. 2016). Hakizimana alleges only one viable adverse employment action and cannot demonstrate the third element of a *prima facie* claim.

#### 1.    Hakizimana's Termination is the Only Adverse Employment Action at Issue.

Conduct rises to the level of adverse employment action when it "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Dick v. Phone Directories Co.*, 397 F.3d 1256, 1268 (10th Cir. 2005) (internal quotation marks

omitted). Actions presenting nothing beyond a "mere inconvenience or alteration of responsibilities," however, do not constitute adverse employment actions. *Id.*

Hakizimana relies on a number of different actions in support of his claims. Only one, however, can be considered an "adverse employment action."[4] Hakizimana alleges that 1) a co-worker directed racial slurs toward him, 2) a co-worker cut him, 3) JBS required him to fill out an incident report, 4) JBS gave him a drug test, 5) JBS did not call his family, 6) JBS did not tell him how many hours he would work, and 6) he was terminated. Compl. at 6. The only adverse employment action among these is Hakizimana's termination.

The conduct of Hakizimana's co-worker Marceleno cannot support an adverse employment action because Marceleno did not have the power to alter Hakizimana's terms of employment, and there is no evidence that JBS' supervisors or managers orchestrated or condoned Marceleno's conduct. The other alleged actions, including the incident report, the drug test, failing to call his family, and not disclosing his work hours, are also insufficient as a matter of law to constitute adverse employment actions. *See Amro v. Boeing Co.*, 232 F.3d 790, 795 (10th Cir. 2000) (plaintiff failed to demonstrate an adverse employment action where his supervisor called him a "fucking foreigner," placed his hands around the plaintiff's neck and patted him down; threw drawing papers at the plaintiff, causing a paper cut on plaintiff's neck; demanded to search through a folder that the plaintiff was carrying; and, on two other occasions, spoke unpleasantly to the plaintiff); *see also Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 533 (10th Cir. 1998) (complained of actions did not amount to an "adverse employment action," including plaintiff's supervisor making several ageist remarks; requiring plaintiff (but no one else) to bring a doctor's note when she was sick; threaten[ing] to write plaintiff up for

---

[4] Plaintiff's Discrimination claim, Claim one, is not accompanied by any facts. Compl. at p. 3.

insubordination; and threaten[ing] to put plaintiff on a plan for improvement); *Heno v. Sprint/United Management Co.*, 208 F.3d 847, 857 (10th Cir. 2000) (no adverse employment action where the plaintiff "was working in the same job, for the same pay, with the same benefits. Moving her desk, monitoring her calls, being 'chilly' toward her, and suggesting that she might do better in a different department simply did not affect [plaintiff's] employment status."); *Dotson v. Gulf*, 2006 WL 44071, *9 (S.D. Tex. 2006) (plaintiff had workplace injury and was drug tested while another employee was not drug tested, the Court held that "[s]ubjecting an employee to a drug test is not an adverse employment action.").

With the exception of Hakizimana's termination, he has not alleged any "adverse employment action" sufficient to support a claim of discrimination under Title VII. Thus, the only alleged "action" at issue in this case is whether Hakizimana was subjected to discrimination when he was terminated for abandoning his work station and walking off the job.

2.    Hakizimana Cannot Present Evidence Supporting An Inference of Discrimination.

There is no evidence to support an inference that Hakizimana's race, color, or national origin as a motivating factor in his termination. Hakizimana does not allege a *single* fact in support of his claim that he was discriminated against based on his race, color, or national origin. *See* Compl. at 3-6. "Vague, conclusory statements" will not suffice to avoid summary judgment. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 674 (10th Cir. 1998). Indeed, in Hakizimana's Complaint he states "Plaintiff's employment was terminated because restrictions limited him to perform any job for defendant." *Id*. at 9. Hakizimana further testified that "the only reason I terminated, I was having disability or in the process of disability." Hakizimana Dep. 103:23-24. It is undisputed that Miller never made any racial comments toward Hakizimana. Hakizimana

17

Dep. 104:13-15. Indeed, Hakizimana admits that he never had any issues with his supervisors or managers prior to, during, or after his termination. Hakizimana Dep. 26:17-27:19. Hakizimana's subjective belief that he was discharged because of his race, color, or national origin is insufficient to support a claim of discrimination. *Bones v. Honeywell Intern., Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) ("To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise.").

The uncontroverted evidence establishes that Hakizimana was terminated for abandoning his work station and leaving JBS' premises without authorization prior to the end of his shift. Miller Dep. 59:6-25. Miller conveyed the termination decision to Hakizimana and his Union representative. Ex. Q. Hakizimana's unsupported opinion fails to meet even the lowest of standards required to show a connection between his termination and any discriminatory motive by JBS. JBS is entitled to summary judgment on Hakizimana's discrimination claim.

### C.     HAKIZIMANA'S HARASSMENT CLAIM FAILS AS A MATTER OF LAW.

Hakizimana's harassment claim fails as a matter of law. Hakizimana's claim is based solely on actions by his co-worker, Marceleno. The elements of coworker harassment are: (1) the plaintiff is a member of a protected group; (2) he experienced unwelcome harassment; (3) the harassment was based on race; (4) the harassment was so severe or pervasive that it altered a term, condition, or privilege of the plaintiff's employment; and (5) a basis for imputing liability to the employer. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672-73 (10th Cir. 1998). Hakizimana cannot establish the third, fourth, and fifth elements of his claim.

 1.     <u>Hakizimana Was Not Harassed Based On His Race, Color, Or National Origin</u>.

Hakizimana cannot show that he experienced actionable harassment based on his race, color, or national origin. To prove harassment, the environment must be both subjectively and objectively hostile. *Adler*, 144 F.3d at 672. "[T]here must be a steady barrage of opprobrious racial comments." *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994). Title VII does not establish "a general civility code" for the workplace, and does not bar "boorish, juvenile, or annoying behavior." *Morris v. City of Colorado Springs*, 666 F.3d 654, 663-664 (10th Cir. 2012) (citation omitted).

Hakizimana alleges that one coworker, Marceleno, called him "nigga" and made "angry faces" toward him while the two worked together. These allegations are insufficient to constitute severe or pervasive conduct. *See Harilall v. Univ. Health Sys. Dev. Corp.*, No. 98-50652, 174 F.3d 197, 201 (5th Cir. 1999) ("Wetback" and "illegal alien" comments did not constitute pervasive harassment); *Boyd v. State Farm Ins. Co.*, 158 F.3d 326, 329-30 (5th Cir. 1998) ("Buckwheat" and "Porch Monkey" comments insufficient to support a verdict of racial discrimination). Hakizimana testified that no other employees made harassing comments toward him. Hakizimana Dep. 26:17-27:19, 104:13-15. Hakizimana does not allege any change to his employment based on Marceleno's alleged comments or the "angry face" Marceleno made. Indeed, "mere utterance of an ... epithet which engenders offensive feelings in an employee, does not sufficiently affect the conditions of employment to implicate Title VII." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

Moreover, the conduct by Marceleno alleged here does not come close to conduct at issue in cases where the Tenth Circuit has held that the evidence of pervasiveness was a "close"

question. *See Lounds v. Lincare, Inc.,* 812 F.3d 1208, 1227 (10th Cir. 2015) (involving multiple and continual references to racial stereotypes, a discussion of lynching, habitual use of the term "nigga," references to "the hood," and direction to address a vice president with "yes massa"); *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680-82, 683 (10th Cir. 2007) (involving several discrete incidents of racial harassment over four years and ongoing harassment, including comments referring to plaintiff's ethnicity every two to three days). Hakizimana has failed to set forth facts sufficient to show that Marceleno's conduct was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Penry v. Fed. Home Loan of Topeka*, 155 F.3d 1257, 1261 (10th Cir. 1998).

Hakizimana further alleges that he was harassed by Marceleno because he believes Marceleno intentionally cut his leg. Compl. at 6. Hakizimana's own statements immediately after the incident, however, belie his current allegations. On the night of the incident, Hakizimana reported "[w]e were working at the gutter table, the person who cut me I was behind him working and after that he done his step of job and he fell [or pull] down sometime cutting me with his knife in his hands." Ex. E. When describing the incident to hospital personnel he reported that "[a]t work while working cutting meat, cut open cow, the person in front of me fell he had a knife in his hand, when he fell he cut my L thigh." Ex. J. Marceleno reported that he "fell down into liver area as I proceeded back up knife was still in right hand reached over and sliced Andre in his left leg." Ex. G. Indeed, all accounts lead to the conclusion that the incident was an accident. JBS and the Greeley Police Department investigated and concluded that the incident was an accident. Exs. H, O. Hakizimana's subjective opinion that Marceleno cut his leg on purpose is insufficient to create a genuine dispute of material fact. *Adler v. Wal-Mart Stores,*

20

*Inc.*, 144 F.3d 664, 674 (10th Cir. 1998) ("Vague, conclusory statements" will not suffice to avoid summary judgment). Thus, the allegation that Marceleno cut Hakizimana is insufficient to support a finding that he was harassed based on his race, color, or national origin.

2.      JBS Is Not Liable For The Alleged Coworker Harassment.

Even assuming Hakizimana's allegations were sufficient to support a hostile work environment claim, he cannot establish a basis for employer liability. To determine whether an employer is liable for coworker harassment, the analysis looks "first, into the employer's actual or constructive knowledge of harassment, and second, into the adequacy of the employer's remedial and preventative responses to any actual or constructively known harassment." *Adler*, 144 F.3d at 673. Hakizimana cannot establish either element.

Hakizimana alleges that his co-worker called him "nigga" and looked at him with an "angry face." Compl. at 6; Hakizimana Dep. 28:4-8. Hakizimana first went to the Union to complain about Marceleno's conduct, and the Union referred him to Human Resources. Hakizimana Dep. 34:2-8, 30:2-22. Human Resources advised Hakizimana to speak to his superintendent. Hakizimana Dep. 31:2-7. The superintendent promptly addressed Hakizimana's complaint by meeting with all the gutters to review JBS' policies against discrimination and discuss how discrimination and harassment is not tolerated at JBS. Hakizimana Dep. 31:3-25, 32:17-21. Marceleno and Hakizimana both attended the meeting. Hakizimana Dep. 32:10-11. Hakizimana did not complain to JBS management again regarding Marceleno's conduct. Hakizimana Dep. 33:14-19. Significantly, Hakizimana admits that he had no issues with any other co-workers, supervisors, or managers. Hakizimana Dep. 26:17-27:19.

As to Hakizimana's after-the-fact allegation that Marceleno cutting his leg was harassment, JBS investigated the incident, interviewed numerous employees within the area,

including Hakizimana and Marceleno, and determined that it was an accident. Exs. E, G, and H. Indeed, the Greeley Police Department investigated the matter and agreed with JBS' conclusion that the incident was an accident. Ex. O. JBS took prompt and appropriate actions to remedy the reported harassment and prevent it from reoccurring.

Hakizimana cannot show that JBS failed to adequately address any alleged harassment. *See Benavides v. City of Okla. City*, 508 Fed. Appx. 720, 724 (10th Cir. 2013) (affirming summary judgment because plaintiff failed to demonstrate city's response to harassment was inadequate where supervisor instructed co-workers to cease, initiated investigation of incident, and imposed discipline); *Bertsch v. Overstock.com*, 684 F.3d 1023, 1027 (10th Cir. 2012) (affirming grant of summary judgment on hostile work environment claim because employer took reasonable corrective action on plaintiff's complaints where employer ordered coworker to remove offensive poster and, after subsequent complaint about coarse email, issued co-worker written warning). Thus, Hakizimana has failed to show that JBS is liable for any alleged harassment by his coworker, Marceleno.

### D.    HAKIZIMANA LACKS A *PRIMA FACIE* CLAIM OF RETALIATION.

Hakizimana lacks a *prima facie* retaliation claim, which requires that, (1) he engaged in protected activity; (2) he suffered an adverse employment action contemporaneous with or subsequent to such protected activity; and (3) there is a causal connection between the protected activity and the adverse employment action. *Daniel v. Loveridge*, 32 F.3d 1472, 1475 (10th Cir. 1994); *Burrus v. United Tel. Co. of Kansas*, 683 F.2d 339, 343 (10th Cir. 1982). Hakizimana cannot establish that he engaged in protected activity, that the challenged action was materially adverse, or a causal connection between the two.

50328629.1

Hakizimana alleges that he was retaliated against because he reported his workplace injury to the Greeley Police Department. Compl. at 6-7. "Filing police reports are not typically protected activity under Title VII," unless the police report concerns conduct prohibited by Title VII. *Goddard v. Artisan Earthworks, LLC*, Case No. 09-2336-EFM, 2010 WL 3909834, at *6 (D. Kan. Oct. 01, 2010). Hakizimana's police report does not concern, mention, or reference any conduct by JBS that is prohibited by Title VII. Instead, the police report solely addresses the alleged assault by Hakizimana's co-worker, Marceleno. Ex. O; Hakizimana Dep. 54:16-55:15. As discussed above, any actions attributed to Marceleno cannot be attributed to JBS because he had no supervisory authority over Hakizimana, and JBS took appropriate remedial measures. Thus, the filing of the police report cannot be considered protected activity as a matter of law.

In support of his retaliation claim, Hakizimana relies on an alleged statement by Health Services Manager Trudy Sawyer after he reported the incident to the police. Compl. at 6-7. Sawyer allegedly stated "why did you had [sic] to call the police? It was an accident." *Id.* Assuming Sawyer made the statement, the statement was not materially adverse as a matter of law. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006) ("The employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.").

In *Garrison v. Gambro, Inc.*, 428 F.3d 933, 939 (10th Cir. 2005) the Tenth Circuit affirmed the District Court's finding that a comment from a vice-president (who, in response to the employee asking for a lawyer to be present in a discussion about separation packages, stated "What do you want? Do you want money or a better job? . . . You can't have your job back, and let's not get the lawyers involved in this") was not materially adverse. *Id.*; *see also Wells v. Colo.*

*Dep't of Transp.*, 325 F.3d 1205, 1214 (10th Cir. 2003) (mere "unsubstantiated oral reprimands" are not in themselves materially adverse). Further, Sawyer took no action affecting Hakizimana's employment. Hakizimana's employment remained unchanged and his pay and schedule remained the same. Hakizimana Dep. 50:1-51:11; Ex. M.

Hakizimana fails to show any causal connection between the alleged protected activity and his termination. Indeed, Hakizimana does not even allege that his termination had anything to do with his filing of the police report. Sawyer was not involved in the decision to terminate Hakizimana's employment. Instead, Miller made the termination decision and Miller informed Hakizimana of his discharge. Miller was not involved in Hakizimana's injury nor did he know that he filed a police report. Miller Dep. 22:13-15, 23:24-24:17, 25:22-26:5; *see Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993) ("to establish a 'causal connection,' plaintiff must show that the individual who took adverse action against him knew of the employee's protected activity.").

Hakizimana, thus, fails to present any evidence to support that he engaged in a protected activity or that the alleged isolated comment from Sawyer was materially adverse. JBS is entitled to summary judgment on Hakizimana's claim of retaliation.

### E.    HAKIZIMANA'S CLAIMS UNDER THE ADA FAIL AS A MATTER OF LAW.

#### 1.    JBS Accommodated Hakizimana's Work Restrictions.

To state a *prima facie* failure to accommodate claim, Hakizimana must establish: (1) he was disabled within the meaning of the ADA; (2) he could perform, either with or without reasonable accommodation, the essential functions of the job; and (3) that "an employer [did not] take reasonable steps to reassign a qualified individual to a vacant position or a position the employer reasonably anticipates will become vacant in the fairly immediate future." *Albert v.*

*Smith's Food & Drug Centers, Inc.*, 356 F.3d 1242, 1252 (10th Cir. 2004).[5] Hakizimana cannot meet any of the required elements.

Hakizimana was not a "qualified individual" under the ADA. Indeed, Hakizimana admits "[his] employment was terminated because ***restrictions limited him to perform any job for defendant***." Compl. at 9 (emphasis added). *See Hardwick v. Amsted Ry.*, 929 F. Supp. 2d 1129, 1136 (D. Kan. 2013) ("If plaintiff is unable to perform an essential function of his job, even with an accommodation, he is, by definition, not a 'qualified individual' and, therefore, not covered under the ADA."). Thus, it is undisputed that, at the time of his discharge, Hakizimana was unable to perform the essential functions of his job as a gutter, even with an accommodation.

Even if the Court were to find that Hakizimana was a qualified individual under the Act, JBS took reasonable steps to accommodate him. Hakizimana sustained his injury on August 17, 2012, and had surgery the following day. The same day, Hakizimana's doctor approved his return to work in a light duty position. Ex. L. Also on August 23, JBS sent a letter to Hakizimana offering him the light duty position in Health Services Observation. Hakizimana accepted this position. Hakizimana Dep. 51:3-5. Hakizimana's pay and hours remained the same compared to his job as a gutter. Hakizimana Dep. 50:1-51:11; Ex. M. JBS took reasonable steps to accommodate Hakizimana's injury and recovery by temporarily reassigning him to work in Health Services Observation.

In *Adra v. Hammerschmidt*, 1995 WL 144760, at *7 (D. Kan. Mar. 22, 1995), the employer offered the plaintiff a light-duty position with the same pay and benefits he had been

---

[5] Recently, the 10th Circuit determined that an "adverse employment action" is an element of a failure to accommodate claim. *Exby-Stolley v. Bd. of Cty. Commissioners, Weld Cty., Colorado*, 906 F.3d 900, 905 (10th Cir.), reh'g *en banc* granted *sub nom. Exby-Stolley v. Bd. of Cty. Commissioners*, 910 F.3d 1129 (10th Cir. 2018). As discussed above, Plaintiff cannot allege an adverse employment action because he remained employed, his pay did not change, and his hours did not change. Hakizimana Dep. 50:1-51:11; Ex. M; *see also infra* Section E(2).

receiving, which accommodated the plaintiff's physician-imposed restrictions. The Court held that reassignment to a job that addresses an employee's physical restrictions, with the same pay and benefits, satisfies the ADA's reasonable accommodation requirement. *Id.* (citing 42 U.S.C. Section 12111(9); *Vande Zande v. Wisconsin Dep't of Admin*, 851 F. Supp. 353, 361 (W.D. Wis. 1994) (quoting *Guice-Mills v. Derwinski*, 967 F.2d 794, 798 (2d Cir. 1992)) ("offering an employee a new position without a reduction in pay or benefits is a reasonable accommodation 'virtually as a matter of law'"), aff'd, 44 F.3d 538 (7th Cir. 1995). JBS fully accommodated Hakizimana's physical restrictions by offering him a light-duty position with the same pay and benefits as his position as a gutter. Thus, JBS is entitled to summary judgment on Hakizimana's failure to accommodate claim.

> 2.   Hakizimana Cannot Establish That He Was Wrongfully Terminated Under The ADA.

To present a claim of wrongful termination under the ADA, Hakizimana must show: (1) he was disabled within the meaning of the ADA; (2) he could perform, either with or without reasonable accommodation, the essential functions of the job; and (3) that he was terminated him because of his disability. *White v. York Int'l Corp.*, 45 F.3d 357, 361 (10th Cir. 1995).

Again, Hakizimana cannot show that he was a qualified individual under the ADA. *See* Compl. at 9 ("Plaintiff's employment was terminated because restrictions limited him to perform any job for defendant."). Indeed, Hakizimana was asked in his deposition, "was there a position you could have performed in November 2012 with the restrictions you had at that time?" Hakizimana responded, "I don't know." Hakizimana Dep. 120:2-5. Hakizimana's own Complaint and testimony show that he believed that he could not perform any job for JBS.

Further, Hakizimana cannot show that JBS terminated him because of his disability. Hakizimana can present no facts to suggest, let alone prove, that the reason for his termination was an alleged disability. Instead, Hakizimana was terminated because he walked off the job during his shift and failed to return to work. Hakizimana admitted that he first left his work station without permission to go to the union and then go to his car to retrieve his phone. Hakizimana further admitted that he left the premises after receiving a written warning and before his work shift was complete. JBS is entitled to summary judgment on Hakizimana's claim alleging wrongful termination under the ADA.

**F.      HAKIZIMANA WAS DISCHARGED FOR A LEGITIMATE, NON-DISCRIMINATORY, AND NON-RETALIATORY REASON.**

JBS terminated Hakizimana's employment for a legitimate, non-discriminatory and non-retaliatory reason, which Hakizimana cannot show is pretext. At this stage, JBS need only state a legitimate, non-discriminatory and non-retaliatory reason for its actions. *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 249, 255-56 (1981). The pretext inquiry focuses on "the facts as they appear to the person making the decision, not the plaintiff's subjective evaluation of the situation." *Lobato v. New Mexico Environment Dept.*, 733 F.3d 1283, 1289 (10th Cir. 2013). In other words, "the relevant inquiry is not whether the employer's proffered reasons were wise, fair, or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." *Id.* JBS had the honest and good faith belief that Hakizimana violated its policies and procedures by leaving JBS' premises without permission prior to the end of his shift.

Hakizimana reviewed and was familiar with JBS' disciplinary policies. Hakizimana Dep. 20:17-21:6; Ex. B. JBS' disciplinary policy prohibits "being out of the work area without supervisor's permission, sleeping on the job. Leaving the company premises before your work

shift ends without getting permission from your supervisor (or the manager in charge of your work area.)" Ex. B at p. 9. On November 23, 2012, Hakizimana first left his work station and the building without permission from his supervisor in order to go to his car and get his phone. Hakizimana Dep. 65:4-11, 67:24-68:4; Ex. Q; Sawyer Dep. 55:12-56:16; Ex. R. After Hakizimana returned to the Health Services Office, Miller and Sawyer questioned him regarding why he walked off the job. Miller Dep. 65:19-66:11. Hakizimana admitted to leaving without permission, going to the union office, and then going to his car to get his phone. Hakizimana Dep. 65:4-11, 67:24-68:4; Miller Dep. 65:19-66:11; Exs. Q, R, and S. Miller issued Hakizimana a final written warning for violating JBS' policies prohibiting leaving his work place on an unscheduled break without authorization. Exs. B at p. 9, Q, R, and S. The written warning specifically states that "[a]ny further occurrences will result in further discipline up to and including termination." Ex. S. After this meeting, Hakizimana went to see his Union Representative again and informed him that he was going home. Hakizimana Dep. at 72:16-19. Hakizimana then left JBS' premises without authorization and before his scheduled work day was completed. *Id.*

Hakizimana does not dispute that 1) he left his work station without permission to go to his car and retrieve his phone, and 2) after he received a final written warning, he left his work station again, and drove home prior to the end of his scheduled shift. These violations occurred in the span of one day. When Hakizimana returned to the plant on November 26, 2012, JBS terminated his employment for walking off the job. Miller Dep. 60:16-61:4. JBS terminated Hakizimana's employment for a legitimate, non-discriminatory and non-retaliatory reason.

G.    **HAKIZIMANA'S CLAIM UNDER THE CWA IS NOT TIMELY.**

Hakizimana's claim for unpaid wages under the CWA is untimely. C.R.S. § 8-4-122 states that "All actions brought pursuant to this article shall be commenced within two years after the cause of action accrues; except that all actions brought for a willful violation of this article shall be commenced within three years after the cause of action accrues and not after that time." *See also Hernandez v. Ray Domenico Farms, Inc.*, 414 P.3d 700, 705 (Colo. 2018) ("We thus hold that while terminated employees may include claims for previously earned wages under section 109, the right to bring those claims is subject to section 122's period of limitations, which runs from the date that the wages first became due and payable. That is, the period begins to run on the payday following the conclusion of the pay period in which the wages were earned—not on the day of termination."). Hakizimana was terminated on November 26, 2012. The statute of limitations for his wage claims expired, at the latest, on November 26, 2015. Hakizimana filed this action on July 24, 2018, nearly six years after his employment ended, and two and a half years after expiration of the statute of limitations. Thus, Plaintiff's wage claim is barred by the statute of limitations and JBS is entitled to summary judgment.

H.    **HAKIZIMANA'S CLAIMS FOR INJURIES SUSTAINED IN THE COURSE OF EMPLOYMENT ARE BARRED BY COLORADO'S WORKERS' COMPENSATION STATUTE.**

Hakizimana alleges unspecified tort claims based on his workplace injury. It is well-settled in Colorado that an injured worker's exclusive remedy for injuries that arise out of and in the course of employment is recovery under the workers' compensation statute. C.R.S. 8-41-102; *Pizza Hut of Am., Inc. v. Keefe*, 900 P.2d 97, 100 (Colo. 1995). The exclusivity provision effectively abolishes all claims accruing to any person on account of injury to an employee. *See Triad Painting Co. v. Blair*, 812 P.2d 638 (Colo.1991); *Continental Sales Corp. v. Stookesberry*,

170 Colo. 16, 459 P.2d 566 (1969). Where the statutory bar applies, it constitutes a complete defense to civil tort liability of an employer. Moreover, employees are barred from maintaining tort actions against either a co-employee or against the employer under the doctrine of *respondeat superior* for intentional torts which arise out of and in the course of employment. *Meeker v. Life Care Ctrs. of Am., Inc.*, 2015 BL 130966, 8 (D. Colo. May 05, 2015) (citations omitted). In other words, "workers' compensation provides the exclusive remedy for an employee injured by an intentional act of a co-employee when both were acting within the course of their employment." *Id.*

JBS filed a workers' compensation claim on behalf of Hakizimana after he sustained his injury. Ex. N. Hakizimana received benefits of $9,000-$10,000 through the workers' compensation system. Hakizimana Dep. 45:14-46:16. Hakizimana disagreed with the amount of his benefits and appealed the compensation award all the way to the Colorado Supreme Court. Indeed, Hakizimana admitted during his deposition that he brought this lawsuit because he believed he deserved more money from his workers' compensation claim. Hakizimana Dep. 124:17-125:5. Thus, to any extent Hakizimana's current claims are based on his workplace injury, they are barred the doctrine of exclusivity.

## IV.   <u>CONCLUSION.</u>

For the foregoing reasons, summary judgment on Hakizimana's Employment Discrimination Complaint is warranted.

WHEREFORE, Defendant JBS USA, LLC n/k/a JBS USA Food Company asks the Court to grant summary judgment in its favor on all of Plaintiff Andre Hakizimana's claims

pursuant to Fed. R. Civ. P. 56(a) and to award Defendant its costs and any other relief the Court deems proper.

Respectfully submitted this 28th day of June, 2019.

SHERMAN & HOWARD L.L.C.

*s/James S. Korte*

Heather Fox Vickles
James S. Korte
633 17th Street, Suite 3000
Denver, CO 80202-3622
Telephone:   (303) 297-2900
Fax:            (303) 298-0940
Email:         hvickles@sahermanhoward.com
Email:         jkorte@shermanhoward.com
*Attorneys for Defendant JBS USA Food Company*

31

**CERTIFICATE OF SERVICE/CM-ECF**

I hereby certify that on this 28th day of June, 2019, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

John-Paul C. Sauer
Nixon Shefrin Hensen Ogburn, P.C.
5619 DTC Parkway, Suite 1200
Greenwood Village, CO 80111
Email: jsauer@nixonshefrin.com
*Attorney for Plaintiff*

*s/Theresa M. Bohrer*
Theresa M. Bohrer, Legal Secretary

50328629.1